Good morning, Your Honors, and may it please the Court, Helgi Walker for Petitioners. I've reserved five minutes of my time for rebuttal. In Sections 18 and 22 of the FTC Act, Congress purposely limited the Commission's authority in order to stop the agency from issuing sweeping rules. In particular, Congress subjected the agency to tight restrictions that apply to no other Federal agency. First, the Commission has no authority to adopt rules unless they are specific and address prevalent practices. And second, the Commission must comply with a long list of procedural requirements, like performing a preliminary regulatory analysis. But the negative option rule covers more than a billion contracts across the entire economy, for everything from newspaper to lawn care, subjecting them to highly generalized terms like material and easy. That is the polar opposite of specific, and it just imports Section 5's general standards while evading its procedural safeguards for business. And last, but definitely not least, in its rush to get this rule out the door, the Commission completely failed to do the preliminary regulatory analysis mandated by the statute. That failure is conceded in the posture of this appeal today, and the Commission has no plausible excuse for why it skipped that critical. Well, I mean, their excuse is that they made an estimate that it was under the threshold value, right? I mean, as I take it, what's kind of the legal standard? I understand with a procedural error, you know, we can vacate the rule and send it back. But how do we look at kind of the Commission's estimate at that point that it didn't meet the threshold? What's the legal standard we use when we consider what to do with that? Well, first we look at the text. The text of the statute says that the Commission shall issue a PRA, that's mandatory, in any case, in any case, in which it issues an NPRM regarding a rule. And a rule as defined under Section 22 is one that the Commission estimates has the requisite effect. It's true that at the outset they estimated less than that. That was not even a colorable guess, as the ALJ explained. But, Your Honor, nothing in the statute says that the NPRM has to — excuse me, that the PRA has to come out at the same time as the PRA. What the Commission should have done when they embraced the ALJ's finding, and they did that in the order on review at Joint Appendix 425, they recounted the ALJ's finding and then said, therefore, in accordance with Section 22, that's a concession that they were accepting the ALJ's finding and felt they needed to proceed under Section 22. That much was correct, Judge Kobus. But what they should have done, and it was very easy, it is not asking a lot of them, was to hit pause, do the preliminary regulatory analysis, put that out in a supplemental notice of proposed rulemaking. The Commission did that in 2008 for the Business Opportunity Rule. They said at 420 and 422 of the Joint Appendix in this order that they were going to do that for other issues. They could have just done that. It would not have been a big deal. I take it the Commission's argument is there's no prejudice here. How do you respond to that? In other words, there was a subsequent regulatory analysis done, right? There was never the preliminary regulatory analysis. Right, but there was a later one, a final analysis. They did a final analysis of the costs of the rule, but what never happened is what Section 22 requires, that the Commission itself do the hard work of thinking about alternatives that might have been just as effective and less costly than the rule that it proposed. Why don't you talk about prejudice to your clients? We suffered clear prejudice because, as an initial matter, Section 22's judicial review provision, C-1, does not include the language about rule of prejudicial error that Section 18 does. It's about preparing for the final order. You didn't have an opportunity to get the later requirements of the preliminary analysis to formulate your comments, right? We never had the opportunity to respond to the Commission's assessment. That's a prejudice argument. Yes, sir. That's per se prejudice under circuit precedent. Citizens Telecom, this court's case, says that. What? Citizens Telecom, this is circuit precedent. That being deprived of a procedural right, like the opportunity to comment, is prejudicial. That's 901F3rd at 1006. Why wasn't that your answer? Why do you go into the statutory language? Well, I just wanted to point out that the judicial review provision of Section 22 doesn't say anything about the rule of prejudicial error. Section 18 does, and that's what the Commission cited. So I wanted to clarify that Section 22 actually appears to presume prejudice from the total failure to do the PRA. That's subsection C1 of Section 22. But you're absolutely right, Judge Loken. Regardless of what the judicial review provision of Section 22 says, it is binding circuit law that being deprived of an opportunity to comment is prejudicial. And the Court went on to explain in Citizens Telecom that to require more than the procedural requirements of the APA. The exact same is true here, Your Honors. If this Court were to simply excuse the Commission's admitted failure to do the PRA and deprive the public of opportunity to interact with them ---- So you think Citizens Telecom is categorical? There would be no exception? There would be no harmless error exception, the way it's said in that case? The standard that the courts have applied, Your Honor, following the American Public Gas decision out of the D.C. Circuit, is that an error is only harmless where it clearly had no bearing, where the outcome was obvious. What case was that? That's the American Public Gas Association out of the D.C. Circuit. But the Fifth Circuit's opinion in the National Auto Dealers case is also highly instructive. There, the Fifth Circuit held in a case under Section 18 that when the FTC skipped an advance notice of proposed rulemaking, just like it skipped, it admits it skipped it. The preliminary regulatory analysis here, that was prejudicial. And the Fifth Circuit explained, we don't ask petitioners to say what they would have done differently or what they might have done differently. It's on the agency to follow the rules. And this isn't some kind of a game of gotcha, Your Honors. Congress added Section 22 in the 1980 amendments precisely to address the overbroad scope, that's the language that was used in the legislative history, to make sure that the commission did the work. I mean, you're citing Senate reports. I mean, if Congress wanted to limit rulemaking to one industry, it would have said so. I was talking about the procedural requirements of Section 22. And your whole specificity argument, I think, or not whole, that's not being fair to you. But there's a chunk in there that talks about the same issue you're getting at here, and that is Congress had all these desires and intents. And even if I accept that, they just didn't find their way into what we consider meaningful. And it may be that you're right that here, and I am switching topics here to the commission here, and that it intended to limit rulemaking to one industry. I just can't find any hook, statutory hook, or a case that says that. Allow me to address that in two parts, Your Honor. First, I just want to finish the prevalence. That's fine. I'll switch horses here. Excuse me. Let me just finish the first horse, which is what I was trying to say, is that the preliminary regulatory analysis that Congress added in Section 22 was meant to be a meaningful exchange. It's not just a check-the-box exercise. The commission itself was supposed to think hard and think seriously about other ways to accomplish the same objective, and then give the public, not just my clients, Your Honor, but the public the opportunity to weigh in on that so that the shape of the rule might be more minimal. That was the purpose. But that's if the legislative history is relevant to the procedural issue. How is it relevant to your — I was going to say that I was going to apologize in advance for bringing up legislative history. It's not always a dirty word. But with respect to the specificity argument, the second horse, Your Honor, has asked me to ride, it is just — we're not saying there's a per se textual requirement. The FTC has characterized that as our argument. That's inaccurate. All we've done is to point out that there's a long historical precedent of the agency limiting Section 18 rules to particular trade sectors, and that that's good evidence of the best way to do it. Are there any previous rules that extended beyond one particular industry? There are some, but they were exempted from Section 18 or Section 18 didn't apply. But the real problem, Your Honor, is that here we have a rule that has nationwide scope. 425.1 of the rule tells us it applies to all negative option contracts in all media across the entire economy. That's the largest scope ever for a Section 18 rule. But it's combined with these general terms that really just repeat Section 5. In the next case, we argue about what's an industry, and we turn this into a Sherman Section 2 inquiry. Well — I'm curious. I mean, that's — and I've seen those. I mean, that was in U.S. v. IBM. Yes, Your Honor, but you don't need to do that now. If one — if Congress says one industry, they know that's going to — at least inside the beltway, that's going to be litigated for years. Well, Your Honor, you don't have to do that here. You can just say this has an unprecedented scope and this is what I wanted to get to. The terms here are very broad. The Commission uses these general phrases like easy, simple, material. That doesn't provide any specific guidance to anybody, and this is very important. Well, aren't they specifically talking about equal dignities, that it's as easy on the cancellation end as it is easily on the commitment end? Well, Your Honor, with all respect, the simple mechanism, simple cancellation mechanism requirement, just when it goes to the next level of saying has to be as easy as the sign-up mechanism, just substitutes the mushy adjective. Well, it might seem — Easy or simple. It might seem mushy, but like in real life, have you ever tried to cancel one of these things? You go through 18 screens, right? It starts off, do you really mean this? You know, yes, yes, yes, yes. Then there's a hook if you answer yes after having answered yes again, after 18 times answering no or vice versa, then you're hooked, right? I mean, it's designed to trick people, right? I mean, I'm just telling you. My experience tells me that when you're sitting at your keyboard trying to cancel one of these things, they ask you 14 questions. But when you signed up, they asked you one. Well, Your Honor, if my — I think your question has two parts, and I'll take it in two parts. The FTC, I want to assure you, and I'm sorry you've had a frustrating experience, has ample authority already. The FTC — Well, wait a minute. It's not about my personal experience. I'm just saying that, you know, the example is it's about equal dignity. So if you've got to answer two questions to get in, you should be able to get out and answer two questions. Well, it sounds easy, but when you get into the details, it's not.  Think about bundled services. You know, you can get your cable TV, your Internet, and your telephone service through one provider, and maybe usually you get a discount for the bundled — That's the chairman's section. — for the bundled service. So customers should be able to know. We should be able to tell them, hey, if you cancel your phone service, you might lose the discount over here. Or we have a new package that lets you keep all three of your services for a lower price. The rule prevents us from having those conversations. It might take a little longer. It might take a little longer for a security company, like Custom Alarm, to make sure that the person trying to turn off the alarm system at somebody's house is really authorized to do that. But I do want to get out two points, Judge Erickson, in response. FTC has tons of tools here. They have enforcement authority under ROSCA for online sales. They have enforcement authority under the telemarketing sales rule for telephone sales. They have authority under the Electronic Funds Transfer Act for anybody that holds a customer account. Meanwhile, the FCC has authority over broadband and cable and satellite TV providers under the Television Viewers Protection Act and the 2021 Infrastructure Act. And last but not least, and I really want to stress this, the commission has its Section 5 authority. I was going to say, that's what I see as the war here. Yes. Section 5 versus Section 18. Absolutely. I couldn't have said it better myself. And if you look at Joint Appendix 21, Your Honor, that is the FTC's negative option enforcement policy statement. At page 21, the FTC lists the same basic requirements as Section 5 requirements that it adopted in this rule. But the agency can't just dump general standards from Section 5 into a Section 18 rule that requires specificity. And the practical upshot of that, Judge Loken, is that the agency gets to skip all the administrative protections and safeguards. And they can go straight to civil penalties. And they get to do that if they were under Section 5. Is that with the lack of enforcement authority under Section 5? It's longer than I've been alive. The 30s. Well, you have long experience, Your Honor. Well, the problem, you're absolutely right, is that under Section 5, the agency has to issue a complaint, give the party notice, opportunity be heard, then issue a consent decree. That consent decree is subject to judicial review all before the agency can seek civil penalties. Why do we have that adjudicatory process? To refine broad words like material and easy. And they have just taken these exact same requirements. I think Joint Appendix 21 is really compelling proof that they've taken what they call the requirements of Section 5, four negative option sellers, and dump them into Section 18. Section 18 rules are supposed to be specific. And the reason they're supposed to be specific is so the agency does the refinement ahead of time and give regulated entities notice of how the heck they are supposed to comply. Because they've gone through the unfair deceptive exercise. Yes, because they've done that. But under these nebulous standards, American business just cannot function at risk of immediate penalties under Section 18. The specificity and the prevalence requirements and, yes, the procedural requirements that were meant to minimize the scope of Section 18 rules are critical to distinguish a Section 18 rule from what the Commission can already do under Section 5. But this is just a backdoor attempt, perhaps after the Supreme Court's decision in AMG that took away some equitable powers from the FTC to seek money damages, to go straight to civil penalties. But that's not fair. We don't have the notice of exactly what the heck is required. Consider the term material. My clients are supposed to disclose all material terms, not just of the negative option feature, but of the product and the service itself, and also not to misrepresent that. But what is material for somebody buying pet food might be totally irrelevant to somebody buying a medical monitoring device. What is easy for one person or one seller, online cancellation, might be impossible for somebody else who doesn't have access to the Internet. These are broad umbrella terms. The Commission had to use broad umbrella terms when you stop and think about it because the scope of the rule is so sweeping. So you think if they had proceeded under Section 5 against a specific perp, if you will, that the issue in the proceeding wouldn't be, they wouldn't be arguing materiality? They could argue materiality, but the important point is that, well, the important point is that the regulated entity would have notice, an opportunity to respond, an opportunity to get review of the consent order in a Federal court before the agency can go to civil penalties. It's that adjudicatory, party-specific, case-specific process. So now the adjudicatory is defending the collection exercise. That often is, but the process that's laid out in Section 5 helps the agency to refine broad words like unfair and even words like material or words like easy. And it's not, you know, it's an important substantive point, Your Honor, because that's how companies get notice of what Section 5 requires. We don't have adequate notice of what Section 18 requires under these general standards. I see I am well into the time that I had saved for rebuttal. If Your Honors have more questions, I'm happy to continue. We would ask you, therefore, to vacate the petitions for review. We think that the preliminary regulatory analysis ground is the cleanest, most straightforward way to dispose of the entire case, but we think the rule also constitutes an obvious evasion of Section 5's procedural safeguards, and that's because the rule is not specific and it does not address prevalent practices. Thank you. Mr. Grossman? Good morning, Your Honors. May it please the Court. Brad Grossman for the Federal Trade Commission. The FTC amended its 1973 negative option rule to address one of the most urgent problems facing consumers today. A majority of Americans have enrolled in recurring charges without realizing it, pay hundreds per month for unwanted subscriptions, and often struggle for months to cancel them. And yet the rule doesn't go or doesn't hit $100 million, right? Well, but the Commission estimated at that moment in time. Well, but what you just said, the entire reason for the rule from the inception was that this is a widespread, multi-industry problem. And then the Commission says, but it's covered by most other regulations and, therefore, it doesn't hit $100 million. Explain that to me. Maybe your argument is it doesn't matter because there's no prejudice later on, but I can't figure out how that happened other than the suggestion that, I don't want to say bad faith, but there was an attempt to manipulate the process. I'd like to start by saying there's absolutely no bad faith here. If Your Honor studies the record of other FTC rules, we regularly issue regulatory analysis. I read the dissenting opinions. And I agree with you. I wouldn't say they accused the majority of bad faith, but they certainly accused the majority of what Judge Kobus just said, manipulating the process. This was a unique circumstance the Commission faced because you had a prevalent, widespread practice that was in fact No, I'm talking about sweeping aside the 2019 proposal. The 2019 proposal was actually quite broad. The 2019 ANPRM said that explicitly sought comment, and 17 industry groups commented on it. They said that what the Commission sought comment on was expanding the rule to cover all negative option programs, and the Commission also explicitly sought comment on including provisions to prevent deceptive and material misrepresentation. So there was no expansion of the ANPRM here. The ANPRM, and I'd refer the Court to question 20 of the ANPRM, it explicitly sought comment on the type of proposal that was issued here. And again, 17 industry groups responded to it. But as for the initial estimate, okay, so the Commission at that time proceeded in good faith, and what it saw was you have a practice that is subject to other laws and regulations, and at that time, the Commission saw virtue in centralizing legal requirements that exist under other statutes and regulations. And that's what the Commission did here. But I'd also note, and I want the Court to focus on the standard of review because I feel like it's received inadequate attention at this point. The standard of review says that the Court may, not must, set aside a Commission order for failure entirely to prepare a regulatory analysis. And I think this is important. But it's de novo on the whether noncompliance with the regulatory analysis, right? Petitioners do not contest the final regulatory analysis. No, the preliminary. The preliminary regulatory analysis. The Commission was required to furnish an estimate. The statute did not specify any kind of methodology. We were talking about standard of review. The standard of review for violating the mandates in Section 18 or procedurally would be de novo, right? If there were a procedural violation, but there is not here. There is no violation here, and please allow me to explain why. So the statute ties the notice of proposed rulemaking requirement to an estimate. It provides no standards for how a Court is to assess whether an estimate is sufficient. It provides no quantum of proof that's required, no methodology. So the Commission furnished its estimate. At that time — Is that nonreviewable then? It looks as if it's committed to agency discretion. That's not to say it's not a requirement. Okay? We acted in good faith. We provided the estimate in good faith. And there are some requirements that agencies are held to that are not reviewable in court, but there is other recourse, including, you know, the President has authority — has a duty to take care that the laws are faithfully executed. But at that time, the Commission furnished its estimate. It announced its estimate. It's got public comment on its estimate. And then what, Your Honors, I think I'd like to point to, the Commission is a multimember body that only acts through a majority vote of its members. Once the NPRM is issued, there's no occasion in the rule for the Commission to, for example, review and monitor estimates in real time in response to changing evidence. The only — the next occasion for the Commission even to think about an estimate is in connection with the final rule. You keep talking about estimates. I'm sitting here looking at 57B3, or I'm looking at B1A. Each regulatory analysis shall contain a statement of the needs and objectives, B, a description of any reasonable alternatives which may accomplish the stated objective, and C, for the proposed rule in each of the alternatives, a preliminary analysis of the projected benefits. That's not — that's not estimate talk. That's — Those requirements — That's putting out information to ensure meaningful responses. All of those requirements, Judge Loken, are triggered by Section 57B3.1, which refers to proposed rule. Rule is then defined in A1 with respect to the estimate. So the — it's only considered a rule at that preliminary stage if the Commission estimates that such amendment will have an annual effect on the national economy. I'm not — I'm not talking about doing it at the time of the 2019. I'm talking about doing it when you accepted — your client accepted the ALJ's finding that the $100 million is satisfied, and now we're going to go forward. At that time, that happens, Your Honor. The Commission is on the — on the brink of finalizing a final rule. It's on the brink of an election, too. That has nothing to do with this. The Commission acted in good faith. But why couldn't it put the brakes on and do — now that it has accepted the ALJ's finding, and whether it accepted it or not, but the ALJ finds it's unrealistically low, and that is not contested at that point. I mean, what — is there a procedural bar at that point for the Commission to say, all right, we're going to pause and we're going to do the — the regulatory assessment that we didn't do before? And maybe it just practically doesn't work. Is that what you're saying? No. I think the Commission has discretion to do so. But in this case, the Commission determined that it had a full rulemaking record. It had the cost estimates that the Petitioners had furnished at the evidentiary  hearing. In your view, what is the purpose of the preliminary regulatory analysis? I mean, the argument, as I understand it from your friend on the other side, is that Congress intended to limit the Commission's ability and that this additional process was required in order to do that. You may not agree with that, but what's your view of it? And can we review an unrealistically low — I understand Your Honors' aversion to legislative history, and I share it. But what the — what the Senate report calls this is a managerial tool, and I think that's apt. The purpose of the regulatory analysis is for the Commission to refine its own internal assessment of — of the costs, benefits, and alternatives of the rule, which, by the way, the NPRM does here. The NPRM mentioned 19 — or, I'm sorry, 12 different alternatives, if you count them up and read through the text for the NPRM, explicitly sought comments and data on alternatives. So a lot of those purposes were, in fact, fulfilled by the surrounding NPRM. But — but I want to go back to this point about procedure. What — what — what compels the Commission to go back when it's about to finalize a rule and — and see comment? And the short answer is that those — A statutory requirement of fair notice to comment to those who are entitled to have a right to comment. There — well, as a statutory matter, there's nothing in the statute that requires the Commission to go back. As for prejudice, Your Honor, I do want to hit prejudice. We're not going back. We're at a place where going forward is a surprise. Yeah. That's the claim. I mean, the claim is, is that — is that they should have had a procedural opportunity to be heard. If they had an opportunity to be heard at the initial process, it may well have had an impact and caused people to look more broadly at what the rulemaking function ought to look like at the end, that they've been deprived of that opportunity, and that what you do at the end doesn't do a thing to solve that problem. And, as you talk about prejudice, you do have to look at Citizens Telecom and look at what it says because, you know, it doesn't quite presume prejudice, but it does say that three weeks' notice isn't enough under any circumstance, and it's pretty dismissive of the argument that it is. And so the flip side kind of becomes, well, if you get no notice — Well, the distinction, Your Honor, is that Judge — Is you get notice at the end. Citizens Telecom was a case where there was no notice of a proposed rule. All of the cases that Ms. Walker cites, the National Auto Dealers case, Brewer, Judge Kelly's opinion in Brewer, those were all cases where there was a wholesale failure of notice of the substance of a proposed rule. That's not the law here. And the cases — and the cases provide that when there's deficient notice, and this goes to the Supreme Court's decision in Shinseki v. Standards, that also was a case about deficient notice, and what Justice Breyer's opinion for the Court said is that's not enough. The plaintiff has to draw, or the challenger has to draw some nexus to the outcome by explaining how the outcome could have turned out differently. And here, I'd refer Your Honors to page 51 of the addendum. The commission thoroughly responded to all of the cost estimates that Petitioners had provided, including at the three-day evidentiary hearing before the administrative law judge, and the commission explained that the — and rejected the entire model on which Petitioners had modeled cost. That's — including footnotes 586 and 587. It's quite thorough. But how about a — how about a comment industry — comment such as it is — it would be arbitrary and capricious to have these general — I know you — I know there's a — I'm not saying nonspecific, but relatively general rules for pet food and beer and wine. Well, the comments from the industry groups, they're there. In the addendum, you could look at the comments from the Chamber of Commerce, NCTA, IAB. They're quite thorough, and it's very hard to — I think that Petitioners cannot plausibly portray this as a lack-of-notice case. When you read their comments, they understood exactly what was being proposed, they understood the commission's assessment of cost, and there's no prejudice. The prejudice — the Petitioners make really two kinds of prejudice claims. I'd like to go through them both to explain why there's no prejudice here. First, the commission estimated that the — in the final regulatory analysis, that the benefits exceeded the costs by a factor of 7 to 1 at a minimum. Petitioners do not challenge that here. Their brief does not claim that the commission's assessment of costs and benefits in the final analysis was incorrect. Second, Petitioners claim that they were prejudiced by an inability to discuss alternatives. But as I think Your Honors could easily note, all of the concerns that Petitioners raise are generalized. They don't say that there was a less restrictive alternative that they would have preferred. The commission did, in fact, propose 12 different alternatives in the notice of proposed rulemaking, including annual reminders, adding a prohibition on what's called saves. How about different rules for some industries? Because they're relatively — they're unique in this context. The commission commented on that, too. Definitely or specifically? The commission — Beer and wine versus pet food. The commission comment — addressed all of that in the notice of proposed rulemaking and explained flat out that you wouldn't be able to achieve the benefits of the rule if you did that. And if you'd like me to pivot to that point, I really do think it's important also to defend the substance of the rule. And the bottom line is, whether it's pet food or some other type of widget, consumers are harmed all the same. They're stuck in subscriptions that they cannot get out of. And as the courts have said, for example, in the Sears Roebuck case we cite, it's not the underlying product. It's how the product is sold. And what the commission found is that with these recurring subscription agreements, they all pose essentially the same types of consumer harm, which the commission was allowed to address by rule. Consumers are signing up to step one of the process. A seller makes misrepresentations. Maybe they're misrepresentations about the payment process. Maybe they're misrepresentations about the product itself. Even so, the harm to consumers is all the same because they get baited into step two. What is step two? Step two is the seller preys upon the consumer's sense of optimism. And in step two, they bury the terms in fine print about the subscription. And the rule says you can't make misrepresentations, right? The rule says you can't make material misrepresentations. But it also notes very specific misrepresentations that are prohibited that the Petitioners don't challenge. But the general is still there. As for the general, we meet the definition of specificity. I'd like to tell Your Honors how. There are two, as I see it, core requirements to specificity. The first core requirement is that the agency is identifying the specific sorts of financial or transactions that apply. Here, the Petitioners do not challenge that. They don't suggest that the Commission's definition of a negative option agreement is in any respect vague or ambiguous. Then the next step is, has the Commission given notice? Has it provided articulated standards for courts to apply? On a case-by-case basis, I think that's enough. And the — Well, on articulated standards, though, your friend on the other side mentioned cancellation, for example, that it may vary based on industry. In other words, in the security context, for example, you know, you can sign up, but you don't want to make canceling as easy as signing up because otherwise someone may be burgling your house. My number one response is the 1973 negative option rule, which Congress blessed, included a requirement that sellers promptly effectuate cancellation requests. Under Petitioners' theory of the case, the Commission wouldn't have even been allowed to do that. Under the 1973 negative option rule also includes a requirement to disclose material terms. It uses the word material. Our mail order rule requires sellers to have a reasonable basis for shipping times they advertise. Under the Petitioners' theory of the case, the Commission can never — But under Section 5, you'll — you constantly have the authority to attack representations that are allegedly material. And here the Commission found that the representations in this circumstance with respect to this clearly limited pattern of conduct has grown to a point that a rule is necessary. And these — Let me throw this analogy out. Sure. It seems to me one way to look at this is that the Commission has used Section 18 to give itself the power that the SEC has under Rule 10b-5, remedial power. And that, it seems to me, should require congressional authority specifically. We do not suggest that the Commission could have adopted a rule that simply banned all material misrepresentations throughout the economy. That is not our argument. It did. We did not. You just said that's the general preface to this with the specific add-ons. We did not, because the ban on material misrepresentations is limited to negative option contracts and is based upon a fully developed factual record showing that it's an extraordinary thing. Most Americans have inadvertently found themselves in a subscription that they're unable — that they did not authorize, did not understand what they were getting into, and, by the way, can take many months to cancel. The Commission is allowed to adopt these rules in response to compelling factual circumstances, and we don't — we, you know, don't hide from the fact that this rule, it's not even — it's not primarily about civil penalties, although we have authority if a scienter requirement is met. But it allows us to get restitution to make consumers whole, but that's also in response to compelling evidence of a problem. And I want to point out, the Petitioners never suggest that any provision of this rule is a violation of Section 5 of the FTC Act. They do not contest that anything subject to this rule was unfair. They only rely on procedural objections. They rely on tendentious definitions of specificity and prevalence. They omit key parts of those definitions by using ellipses. But what you don't see from the Petitioners is any argument that the rule sweeps in conduct that's not unfair or deceptive. So I think that those arguments in total are, you know, they don't — they don't fly, they don't hold. But I think Petitioners' argument, if you look at the rules that we have already — that the Commission has already adopted that Congress blessed, the Petitioners' argument would say, well, Congress allowed the Commission in 1973 to require disclosure of material terms, but the Commission could never amend such a rule in response to modern conditions. That's the Petitioners' argument. And our position is, when Congress blessed the Commission to adopt a rule that required disclosure of material terms, required cancellation, prompt cancellation, inherent in Congress granting us authority to adopt that rule in the first place, we also had authority to amend the rule. And that's what the Commission did here. It took the principles that undergirded the 1973 rule, and it realized that there is an epidemic here. There are consumers being signed up for subscriptions they never authorized. They're being baited by claims that are too good to be true. And then once they're baited, they see that the, you know, the terms of these subscriptions are not authorized. It's affected every — I beg to say, every American or a loved one. The Commission was allowed to target that, seek remedy for consumers. And by the way, you know, Ms. Welker talks about, you know, vagueness in the concept of materiality. I would emphasize, to get civil penalties, the Commission has to show knowledge. And the other point I want to make and close on, in terms of materiality, there is nobody better equipped to understand what misrepresentations are material than the seller itself. The seller is going to know, referring to the definition, what is likely, not merely speculative, what is likely to affect consumer choices regarding the product. And if the consumer — if Ms. Walker's clients don't know what's material, didn't have knowledge, that is a defense for civil penalties. The Petitioners have provided no reason whatsoever to overturn this critically important rule, so we urge the Court to deny the petition for review. Mr. Grossman, what is the effective date of the rule? So the rule is already in effect. The Commission voluntarily stayed most of the compliance deadline. I think it's mid — it's mid-July presently. The Commission said it will be enforcing this rule as of mid-July. If the Court has any further questions, I'm happy to answer them. Otherwise, I would just encourage the Court to deny the petition. Thank you. I'll be as efficient as I can, Your Honor. I may go over the time, but I'll be fast, I promise. First, I want to lock down the $100 million question you were asking about, Judge Loken. That was accepted by the Commission. At Joint Appendix 425, the Commission said, we are accepting that finding. We are proceeding in accordance with it. We're not asking you to review their estimate. We're asking you to enforce the fact that the preliminary regulatory analysis, which was triggered by the $100 million finding, never happened. Also, at JA-427, the Commission does its own estimate in the final rule. That shows the effects of the rule are as high as several hundred billion dollars or several hundred million dollars. And twice in our opening brief, we said the Commission had conceded the $100 million estimate. They never disputed that. The $100 million is a given on this record. The statute does not say, and I think Judge Loken was getting to this, that it's only the initial estimate that counts. The Commission says any estimate of $100 million or more. Once the ALJ made her finding and the Commission then embraced it, it should have hit pause and done the preliminary regulatory analysis. My friend conceded that agencies have discretion to go out for supplemental notices. It happens every day in Washington that agencies go out with further notices of proposed rulemaking. Where was the fire? The Commission, Mr. Grossman said, had an important rule to get done, and it went ahead. Well, the cost of that is that they violated Section 22 because they skipped the preliminary regulatory analysis. Prejudice? We, yes, had a chance to comment on the rule. But what we never had a chance to comment on is what Section 2 requires the Commission to put out, a preliminary analysis of the projected benefits and any adverse economic effects and any other effects of the effectiveness of the proposed rule and each alternative. In Citizens Telecom, this Court said it doesn't matter what people might have said in the comments. Notice has to come. Sometimes we don't need to hear more about the cases. From the agency. The last thing I'd like to say, Your Honor, is that accepting the Commission's argument here on the PRA is just giving them carte blanche to ignore Section 22 in every case. They can just do a low estimate at the beginning, hope they don't get called out on their ridiculously low estimate like the ALJ did here, and then say, oops, now we'll just do a final regulatory analysis in the final rule. But at that point, the horse is out of the barn. The ball game's over. It doesn't matter what they say in the final analysis. For all those reasons, we ask that you please vacate this rule and grant the petitions for review. Thank you so much. Thank you, Counsel. It's a complicated case. It's thoroughly briefed and argument's been well argued and it's been helpful. And we will take it under advisement.